Lessee of BIDDLE *against* DOUGAL and others.

IN ERROR.

*Sunbury,*
*Wednesday,*
June 10.

Although the terms published at the opening of the land office on the 3d of *April* 1769, made all locations void, upon which a survey was not made in six months, and the purchase money paid in twelve, yet these terms were so uniformly relaxed, that in the case of a survey returned before the land had been duly acquired by another, and payment of the purchase money and interest at any time, the courts of law would have prevented the proprietaries from insisting on the forfeiture.

*Hence* where a loose location of the 3d of *April* 1769 was surveyed on the 15th of *May* 1772, and returned into office on the 3d of *July* 1772, but no purchase money was paid until the 27th of *Feb.* 1800, when a warrant of acceptance issued, and a patent was granted, it was held not to be competent to a person claiming under a descriptive location of the same date, surveyed on the 4th of *July* 1774, returned on the 16th and patented on the 17th of *August* 1774, to allege a forfeiture by delay of survey, or non payment of purchase money.

The non payment of purchase money, being a matter between the purchaser and the owner of the soil, no third person can take advantage of it, or has any thing to do with it.

The omission to pay the purchase money, after a survey returned, is not evidence of an abandonment.

THIS was a writ of error to the Common Pleas of *Northumberland* county.

It was an ejectment for sixty-eight acres of land, within the purchase of 1768, to which the plaintiff claimed title under a lottery application of the 3d of *April* 1769, No. 657, in the name of *Philip Harding*, for 300 acres of land upon *Chilisquaque* creek, about three miles from the mouth, in the forks of *Susquehanna.* Upon this a survey was made the 15th of *May* 1772 of 301 acres of land, about one mile from *Chilisquaque* creek, in the forks of *Susquehanna* It was returned into office the 3d of *July* 1772, and on the 27th of *Febrary* 1800 the purchase money was. paid to the commonwealth, a warrant of acceptance issued, and on the 28th a patent was granted.

The defendants claimed under a lottery application of the same date, No. 2732, in the name of *John Blair*, for 300 acres of land " adjoining *John Gillespie* on the east, " bounded by barrens, where he has an improvement in " the forks of the *Susquehanna.*" On the 4th of *July* 1774, a survey of 278 acres was made, including 68 acres of the plaintiff's survey. On the 16th *August* 1774 it was returned and accepted, and the purchase money paid: on the 17th it was patented.

In both cases the title was regularly deduced from *Harding* and *Blair.*

To impeach the defendants survey, (which though posterior to the plaintiff's, was upon a location descriptive of the land in controversy, whereas his own was shifted) the plaintiff gave in evidence the field notes of *Jonathan Lodge* an assistant of *William Scull* the deputy surveyor, to prove that upon the 11th of *October* 1769, he made a survey of 210 acres on *John Blair's* location, which excluded the land in question. And to shew that the survey upon *Harding's* had been an actual and not a chamber survey, he produced a survey for *Joshua Virgin* on the 28th of *November* 1772, calling for lands of *Philip Harding*, which survey for *Virgin* was made by *Lukens*, who made the second survey for *Blair.* There was also evidence of marked trees, conforming to the survey. *Blair* lived upon the land in 1769 when *Lodge's* survey was made.

The defendant on the other hand endeavoured to impeach the plaintiff's title, by raising a question as to its having been made c the ground, and by producing the advertisement at the opening of the land office on the 3d of *April* 1769, in which it was stipulated, that if there was a failure in the party applying, in either procuring his survey and return to be made within six months, or in paying the purchase money and taking out a patent within twelve months, after the application, the proprietaries were to be at liberty to dispose of the land to any other person; and here, long before the purchase money had been paid by the lessor of the plaintiff, they had disposed of the land to *Blair* by accepting his survey of 1774, on payment of the purchase money by him.

The presiding judge in his charge to the jury, countenanced the defendant's objection, and stated the court's opinion to be, that as the survey of neither party was within six months, nor the payment within twelve months, the proprietaries had a right to exact a forfeiture, and to grant the land to whom they pleased; and they had accordingly granted it to *Blair* in 1774.

The court was thereupon requested by the plaintiff's counsel to charge the jury on the following points.

1. Whether in the case of a shifted or removed applica-

1812.

Lessee of
BIDDLE
v.
DOUGAL.

tion, the right does not commence from survey made and returned, and whether a survey returned is not notice to all the world.

The court charged the jury on this point affirmatively; but remarked that if the plaintiff's survey was forfeited by his own neglect and delay in completing his title, and the defendant took advantage of that forfeiture, by completing his title, it did not apply to the present case.

2. Whether a survey made and completed on the ground, can be opened or extended so as to include land surveyed or returned on a posterior or removed warrant.

The court charged, that if the survey was made with the knowledge and approbation of the owner, and not fraudulent, and the other survey was not forfeited and void against a *bona fide* purchaser, it could not be opened.

3. Whether a survey being made for *Blair* in 1769, and completed by *Scull*, and a survey afterwards made for *Harding* and returned, *Lukens* his successor, in 1774 could extend the lines, and include lands in such subsequent right.

The charge of the court was, that if the survey made in 1769 by *Jonathan Lodge*, of the completion of which by *Scull* there was no evidence, was with the knowledge and approbation of *Blair* and not fraudulent, and if the survey of *Harding* was valid and good in 1774, he could not; but if void, the proprietaries could grant the land to whom they pleased.

4. Whether the acquiescence by *Blair* from 1769 to 1774 in the survey made by *Lodge* was not fatal; and whether there could be any extension so as to affect the rights of others fairly acquired.

This was presuming the survey made by *Lodge*, to have been known to *Blair*. It became a nullity by not being returned, and no legal right intervened in 1774, according to the conditions of sale, to prevent the land being granted to *Blair*.

5. The lessor of the plaintiff being a purchaser for a valuable consideration without notice, could he be affected by any latent equity or supposed mistake as to the quantity surveyed on *Blair's* prior right.

Both plaintiff and defendant are *bona fide* purchasers for

a valuable consideration; and if *Blair* obtained a legal title, the equity does not come into question.

6. The survey by *Lodge*, must it not be supposed to have been made with *Blair's* consent; and if he was dissatisfied, ought he not to have immediately complained, and had an order of resurvey or additional survey? If he lay by, until third persons obtained rights, could he affect such rights?

Whether the survey was with the consent of *Blair* or not, is not very material, as *Blair* applied upon the survey in 1774, at which time, it was optional in the proprietary to grant him the land or not.

7. Whether it is essential that all the lines of a survey should be marked on the ground? If any mark is found which designates a survey to have been made on the ground, is it not sufficient? And is not the return, evidence of a survey, until the contrary is established by clear testimony?

It is not essential to mark all the lines. If any mark is found which designates a survey, it is sufficient. The return is evidence until the contrary is clearly proved.

8. If a man holds by improvement, may he not circumscribe it by a survey; and if he does so, can he extend his lines, so as to affect titles acquired in the interim?

He may circumscribe his improvement by a survey, and cannot so extend it as to affect titles so acquired.

9. If a survey is made on a shifted application, and returned, though no purchase money is paid, and the return is after six months, will it not prevail against all who had not a good and subsisting title at the time of return? Does any forfeiture in such a case accrue to the proprietaries or the state, and can the proprietaries or the state consider the land as vacant, and grant it to another by warrant, location, or patent?

Under the conditions of opening the land office at the time of these applications, the survey will not so prevail, and the proprietaries may grant the land over.

There were two other opinions prayed, not material; and the plaintiff excepted to the charge in all the points in which the decision of the court was adverse to him.

The defendants also asked the opinion of the court upon several points, which are not material, except in one respect, the court inclining to think, that by so great a lapse of time

as intervened between the plaintiff's survey in 1772, and the payment of the purchase money in 1800, there had been an abandonment. Verdict for the defendants.*

It was argued in this court by *Watts* and *Duncan* for the plaintiff in error, and by *Fisher* contra.

TILGHMAN C. J. This case appears to have been very warmly contested in the Court of Common Pleas. The opinion of the court was asked on no less than eleven points on the part of the plaintiff, and on four on the part of the defendant. However, as the opinions delivered on most of these points, have been acquiesced in, it is unnecessary to decide on any other questions than those which have been argued in this court.

The plaintiff claims under a location entered by *Philip Harding*, the 3d of *April* 1769, No. 657. A survey of 301 acres was made on this location the 15th of *May* 1772, which was returned to the surveyor-general's office, the 3d of *July* 1772. On the 27th *February* 1800, the purchase money was paid to the commonwealth, and a warrant of acceptance issued; and on the 28th of *February* 1800, a patent was granted to the plaintiff, to whom the title of *Harding* was deduced by a regular chain of conveyances. The plaintiff's location, is not applicable to the land in dispute, but is what is called a shifted location.

The defendants derive their title from a location entered by *John Blair* the 3d of *April* 1769, No. 2732, sufficiently descriptive of the land in dispute. On this location a survey was made by *Charles Lukens*, (deputy surveyor) of 278 acres the 4th of *July* 1774. This survey was returned the 16th of *August* 1774, and the purchase money having been paid to the late proprietaries, a patent issued the 17th of *August* 1774.

Thus it appears, that although the plaintiff's location was preferable in its number, yet the defendants had the right of laying their survey on the land in dispute, because their location called for the land, and the plaintiff's did not. In order to remove this objection to the plaintiff's title, he gave evidence that on the 11th of *October* 1769, a survey was made, but not returned, on *Blair's* location, by *Jonathan*

* *Vide* 2 *Binn.* 38.

*Lodge*, an assistant of *William Scull*, at that time deputy sur-
veyor of the district, *excluding the land in controversy*. This
opened the way for the plaintiff's survey, which being made
and returned two years before the survey under which the
defendants claim, it became a question before the court be-
low, whether the plaintiff had not forfeited all right to the
benefit of his location, by his neglect to have his survey re-
turned and the patent taken out in due time. The court
were of opinion, that a forfeiture had been incurred, and
that the late proprietaries possessed and exercised the right
of granting the land included in the plaintiff's survey, on the
ground of his not having complied with the terms on which
his location was entered. It would have given me great pain,
if in considering this question, I had found any room for
doubt, because I am sensible that the peace of the country
would have been disturbed by it. But I am well satisfied,
that the vast mass of property, depending on location and
survey, without payment of purchase money, rests on foun-
dations too firm to be shaken by any principle of forfeiture.
It is true, that the proprietaries, who at different times dis-
posed of their lands on different terms and in different man-
ners, were owners of the soil, and might sell how they
pleased. But their sales are not to be compared to the sales
of private persons. The great extent of their possessions,
and the multiplicity of their contracts, made it necessary to
establish public offices, in which certain customs prevailed,
which in the course of time acquired strength enough to be
binding on both parties, and which being known both to seller
and purchaser, may be fairly considered as tacitly embodied
in the contract. On the opening of the land office the 3d of
*April* 1769, for the sale of the lands purchased of the *Indians*
at *Fort Stanwix* in *November* 1768, the mode of selling was
by location, survey and patent. A location was a short writ-
ten application for a certain quantity of land, not exceeding
300 acres in a certain place; and the defendants' counsel are
right in saying that the title acquired by a location must be
construed according to the terms published by the secretary
of the land office in *February* 1769. These terms were, that
unless the survey was made and returned in six months, and
the purchase money paid in twelve months, the contract
should be void. I will not say what would have been the

**1812.**

Lessee of
BIDDLE
*v.*
DOUGAL.

consequence, if the proprietaries had thought proper to insist on these terms, because it is notorious that they did not insist on them. We need not trouble ourselves with the consideration of conditions precedent and conditions subsequent; because be they what they may, those who imposed them, had a right to dispense with them, and they did dispense with them. In the first place they received so many locations on the very day of opening the office, (the 3d of *April* 1769,) that the making of surveys in six months was impossible, considering the small number of surveyors appointed by the proprietaries; and no others could make surveys. In the next place, they continued to receive and accept surveys on locations of the 3d of *April* 1769, down to the closing of their offices at the time of the revolution; nor do I believe, that a single instance can be produced of a survey being refused because not made in six months, or a patent denied because the money was not paid in twelve. Where there were conflicting claims, the board of property decided between the parties according to justice and equity; but the idea of excluding one party because he had not strictly complied with the terms of the contract, and granting to the other because it was the will and pleasure of the proprietaries to do so, was never entertained. And if it had been 'entertained, the courts of law would have interposed, because the proprietaries by their uniform conduct, had given just grounds for supposing that they had relaxed the original terms of purchase, and were willing to confirm the title on receiving compensation, that is to say, their principal with interest from the end of six months after entry of the location. I will not enter into the question whether the proprietaries formerly, or the commonwealth now, might not re-grant the land after public notice to the purchasers to come forward and pay their money at a fixed and reasonable time; or whether having parted with the possession in consequence of a survey, they would be put to their action of ejectment to regain it. No step of this kind has been taken by one or the other, and until it is taken, the purchaser has a right to insist on the confirmation of his title, paying principal and interest and the fees of office for issuing a patent.

I have spoken of the general custom of the land office. Let us now examine the conduct of the proprietary officers

in the particular case before us. The first thing that strikes us, is that the surveyor-general received the survey of the plaintiff, although not made till upwards of two years after the entry of the location, and the survey of the defendants, although not made till after more than five years delay. When the defendants' patent issued, does any thing appear from which it may be inferred that it was grounded on the principle of *forfeiture?* I see nothing like it. The facts stand thus: *Charles Lukens* the deputy surveyor did not act properly. He and all other surveyors had standing instructions not to survey lands which had been surveyed before. It appears that he knew of the survey for *Philip Harding*, because he called for it in a survey made by him for *Joshua Virgin* in *November* 1772. It was his duty therefore when he returned the survey on *Blair's* location, to note the interference with *Harding's* survey. This would have given notice to the land officers, in consequence of which they would have called the parties before them and decided after a fair hearing. But the survey for *Blair* being returned without any note of interference, a patent issued of course. It seems then that the forfeiture on which the defendants rest their claim, never entered into the heads of the proprietaries from whom they derive title. And as little has it entered into the contemplation of the commonwealth, for the title of the plaintiff has been confirmed by patent in the year 1800. The former proprietaries were indulgent to their debtors. Their system was liberal, and the people of *Pennsylvania* prospered under it. The commonwealth who succeeded, was sensible of this; and far from insisting on a rigid compliance with the terms of sale, the very act by which she invested herself with the proprietary estate, confirmed those imperfect titles which rested on warrants, locations and surveys. It would be tedious and useless to enumerate the many acts by which these titles have been recognised. Suffice it to say, that time after time the day of payment has been prolonged for those immense arrears, which still remain on lands sold in the time of the late proprietaries. It appears very clearly, then, that the title of the plaintiff cannot be impugned on the ground of forfeiture. Neither do I think, that it can be impeached on the principle of a supposed abandonment. The survey being returned, all that remained to complete the title,

was the payment of the purchase money; and that being a matter between the purchaser and the owner of the soil, no third person can take advantage of it, or has any thing to do with, it. The plaintiff might have made an actual entry immediately after the survey; but if he did not enter, no inference is to be drawn to his prejudice, because we know very well that great quantities of land were taken up by persons who expected no present profit, but meant to keep them unimproved as a provision for their children, or with a view of selling at a distant period. There may indeed in all cases be circumstances in the conduct of the parties, which may impeach the legal title, on equitable considerations. If such circumstances exist in the present case, they are unknown to me, because the parol evidence alluded to in the judge's charge, is not placed on the record. From every thing that appears, the case ought to have been submitted to the jury in the same situation that it would have stood before the board of property, if a *caveat* had been entered by *James Biddle*, on the return of *Blair's* survey in the year 1774. The parties are all purchasers for valuable consideration, without imputation of fraud, and therefore on a footing. I am very clear that the opinion of the Court of Common Pleas on the point of forfeiture was erroneous; therefore the judgment should be reversed, and a *venire de novo* awarded.

YEATES J. The court in their charge to the jury on the trial of this cause declared their opinion, that under the conditions contained in the advertisement of the secretary of the land office on the 23d of *February* 1769, the survey made for *Philip Harding* became forfeited; that it was competent to the late proprietaries to exact that forfeiture and grant the lands surveyed to other persons; and that the 68 acres of land in question legally passed to *John Blair* by their patent of 17th of *August* 1774.

The written papers given in evidence are fully expressed in the charge of the court, and have already been detailed. It remains for us to decide on their legal operation.

A variety of judicial decisions has established certain general principles as to the titles of lands accruing under contracts made with the agents of the late lords of the soil. As owners of the great mass of the landed property within

the province, they had an undoubted right to grant portions thereof in such manner as they thought proper. But when certain settled usages prevailed in their land office, they were as much bound by them, as those who had contracted for their lands, and were as strongly subjected to them as to their concessions made to the first adventurers.

*Applications* for vacant lands, after the death of *William Penn*, and his sons arriving at full age, began on the 1st of *August* 1716. They were the inceptions of right; but of themselves merely conferred no title to any defined tract. They have been called " the expressions of wishes to hold lands at or near a certain spot;" but not being followed up with due diligence, all pretensions of title under them cease, and abandonment of claim is presumed. A close precise *location*, (as it is now called) or one where the lands are sufficiently described, has always been preferred to an undescriptive location though prior in date, if it has not been reduced to certainty by a survey. The right on a descriptive location commences from the time of making the survey; on a shifted location, from the time of its acceptance into the surveyor-general's office. After the occurrence of these facts, the contract between the late proprietaries and the applicants became fully completed, and such portions of land were subtracted from the general mass of property. The former might have maintained a suit for the purchase money; the latter might on tender of the purchase money, interest and fees of office, have compelled the proprietaries in a court of equity to convey to them by patent. These are settled principles, from which it would be highly dangerous now to depart. The interests of the proprietary family and of the inhabitants were happily blended. The former never hunted for forfeitures, nor would such a practice have been beneficial to them; because as they sold their lands at the same prices, they must necessarily have lost the interest accruing on sales already made. The lands thus contracted for, remained chargeable to their just demands into whose hands soever they came.

Why is it to be presumed, that the proprietaries insisted on the literal expressions contained in the advertisement of 23d of *February* 1769? We well know they were liberal landlords, and did not press for escheats for defect of natu-

ralization of aliens, to whom they had granted their lands. They gave every encouragement to the cultivators of the soil, and extended their credits; and in these particulars their example has been wisely followed by the legislature in several successive laws. For above forty years past, ejectments have been maintained on locations and surveys, without any part of the purchase money being paid; which clearly evinces the sense of the courts of justice, that such rights were not avoided by defect of payment of the stipulated sums: and there can be little doubt, that if the proprietaries had brought suits to recover the possession, the proceedings would be staid on the defendant's bringing into court the purchase money, interest, fees of patenting and costs of suit. In this manner full compensation would be made for breach of the condition.

The case of the *Lessee of John Ross* and *John Vaughan* v. *Robert Eason* and *James Morrow* is a solitary instance, wherein the governor for the time being refused to complete a contract made with the officers of colonel *Turbutt Francis's* regiment, so far as it operated in favour of ensign *Morrow*, on the ground of his being charged with the rescue of *Stump* and *Ironcutter*, who had been committed to the gaol of *Cumberland* county for the murder of certain friendly *Indians* on *Middle Creek*. The plaintiff however failed in that action, upon a demurrer to evidence argued fully in this court, though the lessors claimed under a patent granted to captain *Jacob Kern*, another officer of the regiment, which had passed into their hands as *bona fide* purchasers without notice. There the express direction of the governor to annul the special licence so far as it respected the survey drawn for *Morrow*, appeared clearly in evidence. But here no such intention appears. On the contrary, I am fully persuaded from the known practice of the land office, that if *Charles Lukens* the deputy surveyor, had returned on the survey made for *John Blair* on the 4th of *July* 1774, that it comprehended 68 acres of land previously surveyed for *Philip Harding* on the 15th of *May* 1772, which had been returned on the 3d of *July* following into the surveyor-general's office, no such patent would have issued to *John Blair*. At all events, it would not have issued, until Mr. *James Biddle* had an opportunity

of being heard before the board of property; when it would have been in his power to shew that *Blair* was concluded by the marked boundaries of his survey made on the 11th of *October* 1769, and which he had acquiesced in until the 4th of *July* 1774, nearly four and a half years.

Besides, if by rigid rules of law, not applicable to the usages of the land office, a forfeiture was worked by non execution of the order of survey of *Harding* within three years, that forfeiture must be considered as waived by the surveyor-general's acceptance of the return of survey into his office on the 3d of *July* 1772. And if a loss was incurred, and an abandonment presumed as to the sixty-eight acres of land in question, it must necessarily pervade the whole survey and not a portion of it; but this cannot be pretended.

I view an adherence to the general principles of decision which ought to govern the present case, as essentially necessary to the security of landed property, resting originally on applications. A deviation from settled established rules is at all times attended with danger, and peculiarly so when many titles depend on them. Under the circumstances of this case disclosed by the written evidence, I am clearly of opinion that *Philip Harding's* survey was not forfeited; that no advantage was meant to be conferred on *John Blair* for any supposed laches or delay or the part of *Harding*, and that the patent granted to *Blair* was neither intended nor could possibly have the operation of destroying the right of *Harding*, by way of exacting a forfeiture.

I therefore concur in opinion that the judgment of the Court of Common Pleas be reversed, and that a *venire facias de novo* be awarded.

BRACKENRIDGE J. gave no opinion, having been prevented from sitting during the argument.

*Judgment reversed.*