## Troutman *et al. versus* May.

The rights of the Commonwealth are unaffected alike by the statutes of limitation, and by those that authorize the sale of lands for unpaid taxes.

A location and survey, between 1765 and 1769, without payment of any part of the purchase-money, conferred a title to vacant lands, available against all the world except the proprietaries; and an equity against them, which would be enforced on payment of the purchase-money.

Such a title was good without possession or improvements; and it would require strong evidence, to raise a presumption of abandonment against the owner of a location.

A mere intruder cannot set up an alleged abandonment by the owner of a location, for the purpose of defeating a title derived under it.

As against a mere intruder, a sale of unseated lands for taxes, under the laws in force prior to 1815, is good, without proof of a strict compliance with all the provisions of the law authorizing the sale.

Such proof is only required to be made, when the sale is questioned by the former owner, or one claiming under him.

ERROR to the Common Pleas of *Bedford county.*

This was an ejectment by John May against George Troutman and Henry Keyser, for a tract of 302½ acres of land, in Londonderry township, Bedford county.

The plaintiff claimed the land in dispute, by virtue of an order of location, No. 346, issued to John Frazer on the 1st August 1766, for 300 acres of land, " on the head-waters of Wills Creek, south side of the dividing ridge, known by the name of the Two Springs;" and a survey thereon, on the 3d April 1767, of 302½ acres and allowance.

This tract was assessed as unseated land in 1788–9, and sold by the commissioners of Bedford county, for the unpaid taxes, to Marcus Metzger.

On the trial, the plaintiff offered in evidence assessments from the commissioners' office, showing that a tract, in the name of John Frazer, was assessed as unseated, for the years 1788 and 1789, with 17s. 3d. state tax, and 8s. 8d. county tax; also, a manuscript from the commissioners' office, called an advertisement, containing a list of unseated lands, including a tract of 300 acres, in the name of John Frazer; and also, the record of a deed, dated the 25th September 1794, from Anthony Nagle and John Anderson, styling themselves commissioners of Bedford county, to Marcus Medscur, for the tract in question, in which these taxes were recited; recorded on the 3d December 1794. The defendants objected to the admission of this evidence, but the court below overruled the objection, and sealed a bill of exceptions.

Marcus Metzger went into possession of the land about 1810, erected a cabin, cleared some four or five acres of meadow, and

boiled sugar on the premises. On the 13th May 1814, he sold the land to Adam Beltz, by articles of agreement, recorded 7th January 1823. And on the 19th June 1823, the administrators of Marcus Metzger, under the directions of the Orphans' Court, executed to Beltz a deed for the premises.

Adam Beltz moved on the land, occupied the cabin, and cleared some more land; and on the 5th October 1816, he sold the premises, by articles of agreement, to Daniel May. One of the sons of Daniel May moved on the land in 1817, and lived there about a year; and the parties claiming under this title continued to clear more of the tract, from time to time, until 1840, when some 35 or 40 acres were cleared and cultivated. The parties clearing these fields resided on an adjoining tract, and the land they cleared lay adjoining to that on which they lived.

Daniel May, by his will, proved 7th December 1820, devised this tract to his three sons; who, by deed dated the 21st August 1840, conveyed the same to the plaintiff. In 1829, it was sold as the property of Daniel May, deceased, for the payment of debts, to Baltzer Fletcher, to whom a deed was made on the 9th July 1840; and who, on the same day, conveyed his title to the plaintiff.

The plaintiff also proved the payment of taxes. In 1820, it was assessed to Daniel May; and in 1826, 1829, and 1832, to John May.

The defendant, Troutman, claimed the land by virtue of an actual resident settlement thereon, commenced in 1840, and which had been continued up to the 5th November 1856, when this action was brought.

On the trial, the defendants' counsel presented the following points in writing, upon which they requested the court to charge the jury:—

1. That the location or application of John Frazer in 1767, and the survey thereon, the purchase-money never having been paid, possession never having been taken, no taxes paid, and no steps whatever taken to perfect the title, for a period of forty years and upwards, was, in contemplation of law, abandoned, and the land covered by the survey will be regarded as vacant; and that the possession taken by Marcus Metzger, in 1810 or thereabouts, does not change the legal position now assumed by the defendant.

2. That the land being vacant, could only be appropriated by an actual resident settlement of the land, as provided by law, or by warrant and survey.

3. That the improvement commenced by Marcus Metzger gives no title, as the cabin erected by him was abandoned for twenty years, or thereabouts, before the improvement commenced by the defendant.

[Troutman *et al. v.* May.]

4. That, assuming all the evidence on the part of the plaintiff to be true, the plaintiff is not entitled to recover—that his position is no better than that of Frazer, who made the application, if he was the plaintiff, as he has not to this day taken any steps whatever to perfect the title.

5. That the plaintiff cannot call to his aid a derelict title, such as that under the Frazer location, for the purpose of setting up an adverse possession to it, and thus acquire a right to the land under the statute of limitations.

6. That the plaintiff, having voluntarily left, and been out of the possession of the land in dispute for a period of sixteen years, during which time the defendant has been in the notorious possestion, and made valuable improvements, cannot set up his previous possession as the foundation of a title, even although his previous possession may have been continued for twenty-one years. The law under such circumstances will consider his title of possession as abandoned.

7. That from all the facts in this case, the plaintiff cannot recover.

In answer to these points, the court below (KIMMELL, P. J.) instructed the jury as follows :—" This case, in our judgment, differs materially in its facts from Lineweaver *v.* Crawford, 2 *Casey* 417. If the defendants had gone on the land prior to 1810, the year Metzger went into possession, doubtless the plaintiff's title would have been defective, and we would have answered the points in the affirmative. At that time, no effort had been made to complete the purchase, nor had the owners of the Frazer taken possession, and as against an intervening right, the claim under the warrant would have been treated as abandoned. But before such right had accrued to any one, Metzger, then owning or claiming to own the land, under the commissioners' deed, took the possession, and although he paid no purchase-money to the Commonwealth, and his title is in some respects defective, yet, if the jury believe that the entry on the land in 1810, was made under this title, and Metzger and those claiming under him have had the possession, clearing land, year by year, cultivating the whole, paying the taxes, and that they generally exercised such acts of ownership as satisfy you that there was no intention on the part of the owners of this title to abandon the purchase, but that on the contrary, it was the design to complete it; and if such possession extended down to 1840, when Troutman made the entry, then we say, that the plaintiff had acquired such an equity in the land as will entitle him to recover the possession from Troutman, who was a mere intruder. The possession and cultivation of the land by the Mays, was notice to Troutman that the land had been appropriated. The witnesses say that the plaintiff, through his tenants, continued to cultivate

[Troutman *et al. v.* May.]

the land from the time of his purchase. Jacob May testifies that he paid the taxes while he was plaintiff's tenant; and further, under plaintiff's direction, he cut timber on the land, in 1840, preparatory to erecting a house, or of completing the one begun in 1836—that he remained on the land until night-fall of the day preceding the one on which the house was to be erected, and returned next morning with horses and hands to complete the house, and found that over night Troutman had erected a shanty out of the logs on the ground and some others, on the same spot selected by the plaintiff; and when he was told of plaintiff's claim, he refused to go out, and has persisted in his refusal until the present. From these facts, the jury may come to the conclusion, that Troutman made his entry with a full knowledge of plaintiff's claim, and that it was his purpose to steal a night-march on him. The plaintiff does not claim by statute of limitations—the point needs no answer. The defendant could not improve the plaintiff out of his rights; and if such right existed in the plaintiff, as we have instructed you, the sixteen years' possession of the defendant Troutman comes to nothing."

To this charge the defendants excepted; and a verdict and judgment having been rendered for the plaintiff, they removed the cause to this court, and here assigned for error: 1. The admission in evidence of the deed from the commissioners of Bedford county to Marcus Medscur. 2. The charge of the court below.

*King & Jordan*, for the plaintiffs in error.—It has been repeatedly decided, that the party claiming under a tax sale prior to 1815, was bound to show a strict compliance with all the requisites of the-law, before the deed could be admitted in evidence: Wistar *v.* Kammerer, 2 *Yeates* 100; Young *v.* Martin, *Id.* 312; Birch *v.* Fisher, 13 *S. & R.* 208, 1 *W. C. C. R.* 333; Shearer *v.* Woodburn, 10 *Barr* 512.

There is no title to the land in dispute, out of the Commonwealth; and, therefore, it was open to appropriation in 1840, by any party that saw proper to apply for a warrant or commence an improvement. That the Frazer title was abandoned by Frazer himself, can scarcely admit of a question. There is no evidence he ever paid the slightest attention to the land or the title. The doctrine of Lineweaver *v.* Crawford, 2 *Casey* 417, is directly applicable to the facts of this case. A location may, like an improvement right, be forfeited by abandonment: Blaine *v.* Crawford, 1 *Yeates* 289; Strauch *v.* Shoemaker, 1 *W. & S.* 173; McDonald *v.* Mulhollan, 5 *Watts* 173; *Huston on Land Titles* 330–1.

*Mower* and *Cessna*, for the defendant in error, cited Dikeman *v.* Parrish, 6 *Barr* 210; Foster *v.* McDivit, 9 *Watts* 344; Foust *v.* Ross, 1 *W. & S.* 501; Shearer *v.* Woodburn, 10 *Barr* 512.

[Troutman *et al. v.* May.]

The opinion of the court was delivered by

WOODWARD, J.—If the title was not out of the Commonwealth, there was no authority to sell the land for taxes, and the tax title relied on by the plaintiff cannot avail him. For the same reason, he would be forbidden to make title under the statute of limitations. The Commonwealth's rights are unaffected alike by the statutes of limitation, and by those that authorize the sale of lands for unpaid taxes. The first question, therefore, that arises upon this record is, whether the state's title had been divested.

John Frazer's application of 1st August 1766, was surveyed the 3d April 1767, and returned into the land office, and accepted 7th May 1767, but no purchase-money has ever been paid to the Commonwealth.

Applications, or locations, as they are sometimes called, and which are always to be distinguished from applications for warrants, were first introduced by regulations of the land office of 17th June 1765. Previously to that time, surveys were not made upon applications, but only on warrants. It was usual to demand at least part of the purchase-money, when the warrant issued, though it was not always paid. But the location was invented to obviate the necessity of paying any part of the purchase-money before survey. The reason for the change in the policy of the proprietaries was, most likely, found in the growth of rival colonies. Judge HUSTON tells us, in his work, p. 328, that on one occasion, at Sunbury, a few years after he was admitted to the bar, when McKean and Smith presided at Nisi Prius, he heard one or both of them attribute it to this—that the governor of Virginia had offered lands to such as would settle and raise a crop of corn, without the payment of purchase-money; and this induced Governor Penn, and the board of property, to introduce the system by which titles were acquired, without the payment of purchase-money.

The system lasted only until 1769, but in those few years, many titles originated without payment of purchase-money, which have always been sustained, when asserted by persons claiming under them. The applicant was subject to the duty of diligence, so far as related to his procuring a survey and return; but, that done in due time and form, the title was valid against subsequent claimants under the proprietaries. In the case of Lessee of Biddle *v.* Dougal, 5 *Binn.* 152, Judge YEATES said, in 1812, that "for above forty years past, ejectments have been maintained on locations and surveys, without any of the purchase-money being paid; which clearly evinces the sense of courts of justice, that such rights were not avoided by defect of payment of the stipulated sums; and there can be little doubt that if the proprietaries had brought suits to recover the possession, the proceedings would be stayed on the

defendants' bringing into court the purchase-money, interest, fees for patenting, and costs of suit. In this manner full compensation would be made for breach of the condition."

It has never been the policy of the state, to make the non-payment of purchase-money, whether upon warrants, locations, or settlements, a ground of forfeiture. On the contrary, from 1781 down to the present time, legislative inducements, in the form of partial or total releases of interest, have been held out to citizens to pay moneys, which in strict equity ought to have been paid long ago. The state has behaved more as an indulgent parent to landholders, than as a grasping creditor.

Frazer used reasonable diligence in making survey and return of his location, and that gave him title against all the world except the proprietaries, and an equity against them which would be enforced on payment of purchase-money. Counsel insist on an abandonment of his rights, but it was said, in Fisher *v.* Larick, 3 *S. & R.* 321, that the circumstances must be very strong, indeed, to presume that the owner of a location had abandoned his title to the land, and thrown it back on the proprietaries, where he had put his location into the hands of a deputy surveyor, and paid the surveying fees, and the survey had been returned. In Boyles *v.* Kelley, 10 *S. & R.* 217, the survey had not been returned, but the surveyor's fees had been paid, and Chief Justice GIBSON said, it must be considered as if it had been actually returned, "and considering it in that point of view, the other circumstances of the case must be prodigiously strong to raise a legal presumption of abandonment."

We have not a circumstance here, additional to the non-payment of purchase-money, from which to presume abandonment. True, there is no evidence that Frazer took possession or made improvements, but it was not necessary for him to do so, to preserve his paper title. It is to be observed, that the alleged abandonment is set up by a mere intruder. What right has Troutman to allege an abandonment of Frazer's title? He entered in 1840, without title from the Commonwealth, or any other source. If the Commonwealth, and no grantee of hers, claims an abandonment of the Frazer title, it is certainly not competent for a stranger to set up an abandonment of it, for the mere purpose of defeating a title derived under it, and letting himself in. And this is agreeable to the doctrine of Lineweaver *v.* Crawford, 2 *Casey* 419, though the facts of that case are just the converse of this case.

There, the intruder had taken a warrant in 1850, and to defeat a prior improvement, commenced in 1821, he set up an application of Michael Bitner, made and surveyed in 1765, and returned in 1768. No one was claiming under the Bitner location—nobody

[Troutman *et al. v.* May.]

ever had claimed under it. Both the settler and the subsequent warrantee treated the land as vacant; and we treated it as vacant, and adjusted their respective rights accordingly. As against them, we held the Bitner title abandoned, and refused to let the last comer set it up to defeat the first occupier. But here, the last comer alleges the location abandoned for the purpose of defeating a party who claims under it. The same principle of decision that lead us there to declare an abandonment, forbids us to declare it in the circumstances of this case.

If, then, the title to this land was so far divested from the Commonwealth as to give Frazer an estate therein, which is recognised and sustained by law, it was liable to be sold for taxes.

The first Act of Assembly which subjected lands to sale for county rates and levies was passed the 25th of March 1785, and from that time up to 1815, we had various attempts at a legislative system on the subject. But the rule adopted for the interpretation of these statutes was, that the authority must be shown to have been strictly pursued as given. A party claiming land by a tax sale, was held to the necessity of showing, step by step, the regularity of the proceedings, from the assessment to the sale, and if any link in the chain was wanting, the sale was void. The election of assessors—their oaths of qualification—their assessments—the election of county commissioners—their precepts to assessors—their sales or warrants to the sheriff to sell—the advertisements in Philadelphia, as well as in the proper county—and the deeds—all these must be proved, years after their date; and the records and documents of no commissioners' offices, as they were made up and preserved, were competent to supply proof on all these points. The consequence was, that titles under these old Acts of Assembly were regarded as valueless.

The Act of 1815 remodelled the system, and dispensed with the full proof of prerequisites, which had rendered titles under the prior acts unavailable. That the land was unseated, that it had been assessed with taxes which remained unpaid for two years, and that it had been sold for those taxes, were all that this act required to be proved; and tax titles under it soon came to be highly appreciated. Much valuable land is now thus held, and no titles are more stable.

In the year 1840, I instituted, in the Common Pleas of Luzerne county, the suit of Foust *v.* Ross, 1 *W. & S.* 501, and tried it for the plaintiff, but had quitted the bar before it was argued in the Supreme Court. Before it reached the Supreme Court, the case of Foster *v.* McDivit, 9 *Watts* 341, had been there from Huntingdon county. When we tried Foust *v.* Ross, we had not heard of Foster *v.* McDivit, and we showed all we could show in support of our sale, which was under the Act of 1804; but

many links were wanting. The curative provisions of the Act of 1815 did not apply to heal these defects, but we threw ourselves on the principle, that our title, such as it was, was good against everybody but the former owner—that an intruder had no right to question it, and that the strictness of proof required by law, was from deference to the rights of property existing in the former owner; and when neither he, nor any person claiming under him, appeared to resist the tax title, it ought to prevail.

In both of these cases, and afterwards in Dikeman *v.* Parrish, 6 *Barr* 210, and Shearer *v.* Woodburn, 10 *Barr* 512, this principle was adopted and illustrated by the Supreme Court, and may now be regarded as settled law. So that, as against a party in possession, not claiming under him who owned before the tax sale, a deed from the commissioners or sheriff, under any of the Acts of Assembly prior to 1815, is title, and it avails nothing that the legal prerequisites cannot be shown. I will not enlarge upon the doctrine, because it is set forth and defended in the cases referred to better than it could be in my hands.

It is decisive against this defendant. He was a mere intruder. He claimed in no manner under Frazer. He entered upon the land as vacant and unappropriated. But we have shown it was not vacant—that the Commonwealth had parted with the equitable estate to a citizen, in whose hands it was subject to taxation, and the plaintiffs' evidence proves that it was taxed as unseated land of John Frazer, in 1788 and 1789, and was sold for these taxes by the commissioners of Bedford county, on the 25th September 1794, to Marcus Metzger. The plaintiff deduces title regularly from Metzger to himself, and thus shows a perfect right, as against everybody but Frazer, and those claiming under him. Should such a claimant appear, he would be met by the presumptions resulting from non-claim for so long a time, and by the statute of limitations; which would protect any continued possession of twenty-one years that could be made out under the Metzger title. But we are not dealing with such a party now. The defendant is a stranger to Frazer, and his title, and claims in disregard of it. His main position, that this was vacant land, failing him, he stands destitute of all rights to it. He is subject not only to the effects of the tax sale of 1794, but to the statute of limitations.

There was evidence to prove a possession in Metzger, and those claiming under him, for more than twenty-one years, commencing in 1810. If this was made out to the satisfaction of the jury, it was title not only against Troutman but Frazer, and all claiming under him. The purchase-money due the state, is an affair between the state and the present owner, with which Troutman has nothing to do. Payment can be enforced at the pleasure of the

[Troutman *et al. v.* May.]

Commonwealth; but upon the showing before us, it is evident the title is in the plaintiff, and not the defendant, and therefore

The judgment is affirmed.